# EXHIBIT A

IN THE CIRCUIT COURT OF THE 20th
JUDICIAL CIRCUIT IN AND FOR
LEE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. _____

DANIEL STEVENS and
MARY STEVENS,

      Plaintiffs,

vs.

SYNGENTA CROP PROTECTION LLC,
CHEVRON U.S.A., INC.,
HARRELL'S LLC, and PARAMOUNT CHEMICALS & PLASTICS, INC.
      Defendants.

_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

1.      This is an action seeking damages in excess of Fifty Thousand Dollars ($50,000.00) exclusive of fees, costs and interest.

2.      Plaintiffs DANIEL STEVENS and MARY STEVENS are citizens of the State of Florida and citizens of the United States of America.  DANIEL STEVENS was diagnosed with Parkinson's Disease in or about 2005.[1]

3.      Defendants are as follows:

    a.    Defendant SYNGENTA CROP PROTECTION LLC ("SCPLLC") is a Delaware company with its principal place of business in Greensboro, North Carolina.  Its registered agent for service of process is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

    b.    Defendant CHEVRON U.S.A., INC. ("Chevron USA") is a Pennsylvania corporation with its principal place of business in San Ramon in Contra Costa County, California.  Its registered agent for service of process is The Prentice-Hall Corporation System, Inc., 1201 Hays Street, Tallahassee, Florida 32301.

    c.    Defendant HARRELL'S LLC ("Harrell's") is a Florida corporation with its principal place of business in Lakeland, Florida.  Its registered agent for service of

---

[1] Plaintiffs had no reason to believe there was any link between paraquat exposure and Daniel Stevens' Parkinson's disease until no earlier than 2022 when he saw information on television discussing the possible link between paraquat and Parkinson's Disease.

1

process is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

d.   Defendant PARAMOUNT CHEMICALS & PLASTICS, INC. ("Paramount") is a Florida corporation with its principal place of business in Felda, Florida.   Its registered agent for service of process is Mark A. Robbins, 3601 Packinghouse Road, Alva, Florida 33920.

4.   The Defendants are corporations who are amendable to jurisdiction in the Courts of Florida because they are either Florida corporations or foreign corporations that now conduct or have conducted business or business ventures, or have had offices or agencies within Florida, which subjects them to jurisdiction within Florida.  The alleged causes of action arise out of, or are incidental, to the business or business ventures conducted within Florida by each of the Defendants or through which the Defendants purposefully directed themselves at Florida or otherwise could reasonably have foreseen that their activities would subject them to jurisdiction of the Florida courts.  Each foreign corporation has through brokers, jobbers, wholesalers, or distributors sold, consigned, or leased tangible or intangible personal property to persons in this state.   Each foreign corporation has committed wrongful acts either outside or inside this state causing injury to Plaintiff DANIEL STEVENS.  Each foreign corporation derives substantial revenue from interstate or international commerce and should reasonably have expected their acts to have consequences in this state or any other state.  Each foreign corporation has conducted substantial and not isolated activity within Florida. Furthermore, pursuant to Florida Statute 47.011 and 47.051, venue of this matter is proper in Lee County, Florida because Plaintiffs live in Lee County and Plaintiff, Daniel Stevens, was exposed to paraquat containing products in Lee County and was diagnosed and treated in Lee County.

5.   The Defendants are corporations who are amenable to jurisdiction in the Courts of Florida for numerous reasons, including, but not limited to:

a.   Defendants are either Florida corporations or foreign corporations that now conduct or have conducted business or business ventures, or have had offices or agencies within Florida, which subjects them to jurisdiction within Florida;

b.   The alleged causes of action arise out of, or relate to, the business or business ventures conducted within Florida by each of the Defendants or through which the Defendants purposefully availed themselves of Florida, invoked the benefits and protections of Florida law, or otherwise could reasonably have foreseen that their activities would subject them to jurisdiction of the Florida courts;

c.   Defendants' paraquat containing products were sold in Florida;

2

 d. Defendants' paraquat containing products acted upon Mr. Stevens in Florida when he worked with and around Defendants' paraquat containing products in Florida.

 e. The foreign corporation Defendants engaged in a course of conduct that was nationwide, including within Florida, in its distribution and sale of paraquat containing products and/or in its failure to provide adequate warnings;

 f. Each foreign corporation Defendant specifically targeted Florida as a market for its paraquat containing products;

 g. The foreign corporation Defendants have through agents, employees, brokers, jobbers, wholesalers, or distributors sold, consigned, licensed or leased tangible or intangible personal property to persons in Florida;

 h. The foreign corporation Defendants have committed wrongful acts either outside or inside Florida causing injury to Plaintiff as a result of products, materials, or things processed, serviced, or manufactured by Defendants that were used or consumed within the state of Florida in the ordinary course of commerce, trade or use, including breaching its continuing duty to warn Mr. Stevens to avoid further exposure to paraquat containing products;

 i. The foreign corporation Defendants derive substantial revenue from interstate or international commerce and should reasonably have expected its acts to have consequences in Florida or any other state that would subject it to liability in those states;

 j. The foreign corporation Defendants have conducted substantial and not isolated activity within Florida;

 k. The foreign corporation Defendants registered for the right to conduct intrastate business in Florida, conducted intrastate business in Florida pursuant to such registration, maintained a registered agent for service of process in Florida, and/or was served with process in this case via its Florida registered agent; and/or

 l. Purposely availed itself of the Florida market by directly or indirectly distributing to the state of Florida.

 6. Each Defendant designed, manufactured, supplied, sold and/or distributed products containing paraquat ("Paraquat-Containing Products").

3

7.      Plaintiffs allege that the Defendants have, at all times material to these causes of action, and through and including the present, maintained sufficient contact with the State of Florida and/or transacted substantial revenue producing business in the State of Florida to subject them to the jurisdiction of this Court pursuant to Florida Statute 48.181 and/or 48.182 and/or 48.193 and/or 47.16.

## BACKGROUND

8.      Plaintiff DANIEL STEVENS ("Plaintiff" or "DANIEL STEVENS") was born on 04/21/1948.

9.      Plaintiff DANIEL STEVENS worked with and was exposed to products containing paraquat that were designed, manufactured, supplied, sold and/or distributed by the Defendants, or their predecessors.

10.      Plaintiff DANIEL STEVENS was exposed to, breathed, ingested and/or absorbed paraquat when he worked with and around Defendants' Paraquat-Containing Products.

11.      Plaintiff DANIEL STEVENS, and those around him, used Defendants' Paraquat-Containing Products in the intended manner and without significant change in the Paraquat-Containing Products' condition.  Plaintiff DANIEL STEVENS relied upon the Defendants to instruct him and those working around him regarding the proper methods or handling the products, being unaware of the dangerous properties of paraquat.

12.      Plaintiff DANIEL STEVENS would inhale, breathe, ingest and/or absorb paraquat from Defendants' Paraquat-Containing Products, including but not limited to Gramoxone, while mixing and applying said products at Quail Run Nursery from the mid-1970s until approximately 2017.

13.      Those Paraquat-Containing Products to which Plaintiff was exposed during his employment were purchased at retailers, including but not limited to Paramount and Harrel's.

14.      Plaintiff's exposure to and inhalation of paraquat from Defendants' Paraquat-Containing Products caused him to develop Parkinson's disease, which he was diagnosed with in or around 2005.

**Defendants and Their Corporate Predecessors**

**Syngenta Entities**

15.      In 1926, four British chemical companies merged to create the British company that then was known as Imperial Chemical Industries Ltd. and ultimately was known as Imperial Chemical Industries PLC ("ICI").  In or about 1971, ICI created or acquired a wholly owned U.S. subsidiary organized under the laws of the State of Delaware, which at various times was known as Atlas

4

Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc., and ultimately was known as ICI Americas Inc. (collectively, "ICI Americas"). In or about 1992, ICI merged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, including the agrochemicals business it had operated at one time through a wholly owned British subsidiary known as Plant Protection Ltd. and later as a division within ICI, into a wholly owned British subsidiary known as ICI Bioscience Ltd. In 1993, ICI demerged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, from which it created the Zeneca Group, with the British company Zeneca Group PLC as its ultimate parent company.

16. As a result of ICI's demerger and creation of the Zeneca Group, ICI Bioscience Ltd. was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca Ltd., a wholly owned British subsidiary of Zeneca Group PLC. Before ICI's demerger and creation of the Zeneca Group, ICI had a Central Toxicology Laboratory that performed and hired others to perform health and safety studies that were submitted to the U.S. Department of Agriculture ("USDA") and the U.S. Environmental Protection Agency ("EPA") to secure and maintain the registration of paraquat and other pesticides for use in the United States.

17. As a result of ICI's demerger and creation of the Zeneca Group, ICI's Central Toxicology Laboratory became Zeneca Ltd.'s Central Toxicology Laboratory. After ICI's demerger and creation of the Zeneca Group, Zeneca Ltd.'s Central Toxicology Laboratory continued to perform and hire others to perform health and safety studies that were submitted to EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States. As a result of ICI's demerger and creation of the Zeneca Group, ICI Americas was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca, Inc. ("Zeneca"), a wholly owned subsidiary of Zeneca Group PLC organized under the laws of the State of Delaware.

18. In 1996, the Swiss pharmaceutical and chemical companies Ciba-Geigy Ltd. and Sandoz AG merged to create the Novartis Group, with the Swiss company Novartis AG as the ultimate parent company. As a result of the merger that created the Novartis Group, Ciba-Geigy Corporation, a wholly owned subsidiary of Ciba-Geigy Ltd. organized under the laws of the State of New York, was merged into, or continued its business under the same or similar ownership and management as Novartis Crop Protection, Inc. ("NCPI"), a wholly owned subsidiary of Novartis AG organized under the laws of the State of Delaware.

19. In 1999, the Swedish pharmaceutical company Astra AB merged with Zeneca Group PLC to create the British company AstraZeneca PLC, of which Zeneca Ltd. and Zeneca were wholly

owned subsidiaries.  In 2000, Novartis AG and AstraZeneca PLC spun off and merged the Novartis Group's crop protection and seeds businesses and AstraZeneca's agrochemicals business to create the Syngenta Group, a global group of companies focused solely on agribusiness, with Defendant SAG as the ultimate parent company.

20.     As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd. was merged into, renamed, or continued its business under the same or similar ownership and management as Syngenta Ltd., a wholly owned British subsidiary of SAG; and Zeneca Ltd.'s Central Toxicology Laboratory became Syngenta Ltd.'s Central Toxicology Laboratory.  Since the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Syngenta Ltd.'s Central Toxicology Laboratory has continued to perform and hire others to perform health and safety studies for submission to the EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States.

21.     As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, NCPI and Zeneca were merged into and renamed, or continued to do their business under the same or similar ownership and management, as Syngenta Crop Protection, Inc. ("SCPI"), a wholly owned subsidiary of SAG organized under the laws of the State of Delaware.  In 2010, SCPI was converted into Defendant SCPLLC, a wholly owned subsidiary of SAG organized and existing under the laws of the State of Delaware with its principal place of business in Greensboro, North Carolina.

22.     As a result of these various transactions, discussed *supra*:

- SAG is a successor by merger or continuation of business to its corporate predecessor Novartis AG;

- SAG is a successor by merger or continuation of business to its corporate predecessor AstraZeneca PLC;

- SAG is a successor by merger or continuation of business to its corporate predecessor Zeneca Group PLC;

- SAG is a successor by merger or continuation of business to its corporate predecessor Imperial Chemical Industries PLC, previously known as Imperial Chemical Industries Ltd.;

- SAG is a successor by merger or continuation of business to its corporate predecessor ICI Bioscience Ltd.; and

- SAG is a successor by merger or continuation of business to its corporate predecessor Plant Protection Ltd.

23.     Additionally, as a result of these various transactions, discussed *supra*:

6

- SCPLLC is a successor by merger or continuation of business to its corporate predecessor SCPI;

- SCPLLC is a successor by merger or continuation of business to its corporate predecessor NCPI;

- SCPLLC is a successor by merger or continuation of business to its corporate predecessor Ciba-Geigy Corporation;

- SCPLLC is a successor by merger or continuation of business to its corporate predecessor Zeneca Inc.; and

- SCPLLC is a successor by merger or continuation of business to its corporate predecessor ICI Americas Inc., previously known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc.

1.     SCPLLC is registered to do business in the State of Florida and SCPLLC does substantial business in the State of Florida, including the following:

   a.   markets, advertises, distributes, sells, and delivers paraquat and other pesticides to distributors, dealers, applicators, and farmers in the State of Florida;

   b.   secures and maintains the registration of paraquat and other pesticides with the EPA and the Florida Department of Agriculture to enable itself and others to manufacture, distribute, sell, and use these products in the State of Florida; and

   c.   performs, hires others to perform, and funds or otherwise sponsors or otherwise funds the testing of pesticides in the State of Florida.

24.     SAG is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business in Basel, Switzerland.  SAG is a holding company that owns stock or other ownership interests, either directly or indirectly, in other Syngenta Group companies, including SCPLLC.  SAG is a management holding company.

25.     Syngenta Crop Protection AG ("SCPAG"), a Swiss corporation with its principal place of business in Basel, Switzerland, is one of SAG's direct, wholly owned subsidiaries.  SCPAG employs the global operational managers of production, distribution, and marketing for the Syngenta Group's Crop Protection ("CP") and Seeds Divisions.  The Syngenta Group's CP and Seeds Divisions are the business units through which SAG manages its CP and Seeds product lines.  The Syngenta Group's CP and Seeds Divisions are not and have never been corporations or other legal entities.

26.     SCPAG directly and wholly owns Syngenta International AG ("SIAG").  SIAG is the "nerve center" through which SAG manages the entire Syngenta Group.  SIAG employs the "Heads" of the Syngenta Group's CP and Seeds Divisions.  SIAG also employs the "Heads" and senior staff of various global functions of the Syngenta Group, including Human Resources, Corporate Affairs,

7

Global Operations, Research and Development, Legal and Taxes, and Finance.  Virtually all of the Syngenta Group's global "Heads" and their senior staff are housed in the same office space in Basel, Switzerland.

27.     SAG is the indirect parent of SCPLLC through multiple layers of corporate ownership:

    a.   SAG directly and wholly owns Syngenta Participations AG;

    b.   Syngenta Participations AG directly and wholly owns Seeds JV C.V.;

    c.   Seeds JV C.V. directly and wholly owns Syngenta Corporation;

    d.   Syngenta Corporation directly and wholly owns Syngenta Seeds, LLC; and

    e.   Syngenta Seeds, LLC directly and wholly owns SCPLLC.

28.     Before SCPI was converted to SCPLLC, it was incorporated in Delaware, had its principal place of business in North Carolina, and had its own board of directors.  SCPI's sales accounted for more than 47% of the sales for the entire Syngenta Group in 2019.

29.     SAG has purposefully organized the Syngenta Group, including SCPLLC, in such a way as to attempt to evade the authority of courts in jurisdictions in which it does substantial business.  Although the formal legal structure of the Syngenta Group is designed to suggest otherwise, SAG in fact exercises an unusually high degree of control over its country-specific business units, including SCPLLC, through a "matrix management'' system of functional reporting to global "Product Heads" in charge of the Syngenta Group's unincorporated Crop Protection and Seeds Divisions, and to global "Functional Heads" in charge of human resources, corporate affairs, global operations, research and development, legal and taxes, and finance.

30.     The lines of authority and control within the Syngenta Group do not follow its formal legal structure, but instead follow this global "functional" management structure.  SAG controls the actions of its far-flung subsidiaries, including SCPLLC, through this global "functional" management structure.  SAG's board of directors has established a Syngenta Executive Committee ("SEC"), which is responsible for the active leadership and the operative management of the Syngenta Group, including SPLLC.  The SEC consists of the CEO and various global Heads, which currently are:

    a.   The Chief Executive Officer;

    b.   Group General Counsel;

    c.   The President of Global Crop Protection;

    d.   The Chief Financial Officer;

    e.   The President of Global Seeds; and

    f.   The Head of Human Resources;

31.     SIAG employs all of the members of the Executive Committee.

8

32.     Global Syngenta Group corporate policies require SAG subsidiaries, including SPLLC, to operate under the direction and control of the SEC and other unincorporated global management teams.  SAG's board of directors meets five to six times a year.  In contrast, SCPI's board of directors rarely met, either in person or by telephone, and met only a handful of times over the last decade before SCPI became SCPLLC.

33.     Most, if not all, of the SCPI board's formal actions, including selecting and removing SCPI officers, were taken by unanimous written consent pursuant to directions from the SEC or other Syngenta Group global or regional managers that were delivered via e-mail to SCPI board members. Since SCPI became SCPLLC, decisions that are nominally made by the board or managers of SCPLLC in fact continue to be directed by the SEC or other Syngenta Group global or regional managers. Similarly, Syngenta Seeds, Inc.'s board of directors appointed and removed SCPI board members at the direction of the SEC or other Syngenta Group global or regional managers.  Since SCPI became SCPLLC, the appointment and removal of the manager(s) of SCPLLC continues to be directed by the SEC or other Syngenta Group global or regional managers.

34.     The management structure of the Syngenta Group's CP Division, of which SCPLLC is a part, is not defined by legal, corporate relationships, but by functional reporting relationships that disregard corporate boundaries.  Atop the CP Division is the CP Leadership Team (or another body with a different name but substantially the same composition and functions), which includes the President of Global Crop Protection, the CP region Heads (including SCPLLC President Vern Hawkins), and various global corporate function Heads.  The CP Leadership Team meets bi-monthly to develop strategy for new products, markets, and operational efficiencies and to monitor performance of the Syngenta Group's worldwide CP business.

35.     Under the CP Leadership Team are regional leadership teams, including the North America Regional Leadership Team (or another body with a different name but substantially the same composition and functions), which oversees the Syngenta Croup's U.S. and Canadian CP business (and, when previously known as the NAFTA Regional Leadership Team, also oversaw the Syngenta Group's Mexican CP business).  The North America Regional Leadership Team is chaired by SCPLLC's president and includes employees of SCPLLC and the Syngenta Group's Canadian CP company (and when previously known as the NAFTA Regional Leadership Team, also included employees of the Syngenta Group's Mexican CP company).

36.     The Syngenta Group's U.S. and Canadian CP companies, including SCPLLC, report to the North America Regional Leadership Team, which reports the CP Leadership Team, which reports to the SEC, which reports to SAG's board of directors.  Some members of the North America

9

Regional Leadership Team, including some SCPLLC employees, report or have in the past reported not to their nominal superiors within the companies that employ them, but directly to the Syngenta Group's global Heads.  Syngenta Group global Heads that supervise SCPLLC employees participate and have in the past participated in the performance reviews of these employees and in setting their compensation.

37.     The Syngenta Group's functional reporting lines have resulted in employees of companies, including SCPLLC, reporting to officers of remote parent companies, officers of affiliates with no corporate relationship other than through SAG, or officers of subsidiary companies.  SCPLLC performs its functions according to its role in the CP Division structure:

a.  CP Division development projects are proposed at the global level, ranked, and funded at the global level after input from functional entities such as the CP Leadership Team and the North America Regional Leadership Team, and given final approval by the SEC;

b.  New CP products are developed by certain Syngenta Group companies or functional groups that manage and conduct research and development functions for the entire CP Division;

c.  These products are then tested by other Syngenta Group companies, including SCPLLC, under the direction and supervision of the SEC, the CP Leadership Team, or other Syngenta Group global managers;

d.  Syngenta Group companies, including SCPLLC, do not contract with or compensate each other for this testing;

e.  Rather, the cost of such testing is included in the testing companies' operating budgets, which are established and approved by the Syngenta Group's global product development managers and the SEC;

f.  If a product shows promise based on this testing and the potential markets for the product, either global or regional leaders (depending on whether the target market is global or regional), not individual Syngenta Group companies such as SCPLLC, decide whether to sell the product;

g.  Decisions to sell the product must be approved by the SEC; and

h.  The products that are sold all bear the same Syngenta trademark and logo.

38.     SCPLLC is subject to additional oversight and control by Syngenta Group global managers through a system of "reserved powers" established by SAG and applicable to all Syngenta Group companies.  These "reserved powers" require Syngenta Croup companies to seek approval for certain decisions from higher levels within the Syngenta Group's functional reporting structure.  For example, although SAG permits Syngenta Croup companies to handle small legal matters on their own,

10

under the "reserved powers" system, SAG's Board of Directors must approve settlements of certain types of lawsuits against Syngenta Group companies, including SCPLLC, if their value exceeds an amount specified in the "reserved powers."

39.     Similarly, the appointments of senior managers at SCPLLC must be approved by higher levels than SCPLLC's own management, board of directors, or even its direct legal owner. Although SCPLLC takes the formal action necessary to appoint its own senior managers, this formal action is in fact merely the rubber-stamping of decisions that have already been made by the Syngenta Group's global management.

40.     Although SAG subsidiaries, including SCPLLC, pay lip service to legal formalities that give the appearance of authority to act independently, in practice many of their acts are directed or pre-approved by the Syngenta Group's global management.  SAG and the global management of the Syngenta Group restrict the authority of SCPLLC to act independently in areas including:

    a.   Product development;

    b.   Product testing (among other things, SAG and the global management of the Syngenta Group require SCPLLC to use Syngenta Ltd.'s Central Toxicology Laboratory to design, perform, or oversee product safety testing that SCPLLC submits to the EPA in support of the registrations of paraquat and other pesticides);

    c.   Production;

    d.   Marketing;

    e.   Sales;

    f.   Human resources;

    g.   Communications and public affairs;

    h.   Corporate structure and ownership

    i.   Asset sales and acquisitions

    j.   Key appointments to boards, committees, and management positions;

    k.   Compensation packages;

    l.   Training for high-level positions; and

    m.   Finance (including day-to-day cash management) and tax.

41.     Under the Syngenta Group's functional management system, global managers initiate, and the global Head of Human Resources oversees international assignments and compensation of managers employed by one Syngenta subsidiary to do temporary work for another Syngenta subsidiary in another country. This international assignment program aims, in part, to improve Syngenta Group-wide succession planning by developing corporate talent to make employees fit for higher positions within the global Syngenta Group of companies.  Under this international assignment program, at the

11

instance of Syngenta Group global managers, SCPLLC officers and employees have been "seconded" to work at other SAG subsidiaries, and officers and employees of other Syngenta Group subsidiaries have been "seconded" to work at SCPLLC.

42.     The Syngenta Group's functional management system includes a central global finance function—known as Syngenta Group Treasury—for the entire Syngenta Group.  The finances of all Syngenta Group companies are governed by a global treasury policy that subordinates the financial interests of SAG's subsidiaries, including SCPLLC, to the interests of the Syngenta Group as a whole.  Under the Syngenta Group's global treasury policy, Syngenta Group Treasury controls daily cash sweeps from subsidiaries such as SCPLLC, holds the cash on account, and lends it to other subsidiaries that need liquidity.  The Syngenta Group's global treasury policy does not allow SAG subsidiaries such as SCPLLC to seek or obtain financing from non-Syngenta entities without the approval of Syngenta Group Treasury.  Syngenta Group Treasury also decides whether SCPLLC will issue a dividend or distribution to its direct parent company, and how much that dividend will be.  SCPLLC's board or management approves dividends and distributions mandated by Syngenta Group Treasury without any meaningful deliberation.

43.     In 2011, a federal District Court held that SAG's unusually high degree of control over SCPLLC made SCPLLC the agent or alter ego of SAG and therefore subjected SAG to jurisdiction in the State of Illinois. *See City of Greenville, Ill. v. Syngenta Crop Protection, Inc.*, 830 F. Supp. 2d 550 (S.D. Ill. 2011).  SAG continues to exercise the unusually high degree of control over SCPLLC.  SAG, through its agent or alter ego, SCPLLC, does substantial business in the State of Florida, in the ways previously alleged as to SCPLLC.

**Chevron Entities**

44.     Chevron Chemical Company ("Chevron Chemical") was a corporation organized in 1928 under the laws of the State of Delaware.  In 1997, Chevron Chemical was merged into Chevron Chemical Company LLC ("Chevron Chemical LLC"), a limited liability company organized under the laws of the State of Delaware.  In the mid-2000s, Chevron Chemical LLC was merged into or continued to operate under the same or similar ownership and management as Defendant CP Chemical, a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business in The Woodlands, Texas.

45.     As a result of these various transactions, discussed *supra*: CP Chemical is a successor by merger or continuation of business to its corporate predecessor Chevron Chemical LLC; and CP Chemical is a successor by merger or continuation of business to its corporate predecessor Chevron Chemical.

12

46.     CP Chemical is registered to do business in the State of Florida, and does substantial business in the State of Florida, including King County; among other things, it owns and/or operates numerous filling stations in King County.

47.     Defendant Chevron USA is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business in the State of California.  Chevron USA is registered to do business in Florida.  In the mid-2000s, Chevron USA entered into an agreement in which it expressly assumed the liabilities of Chevron Chemical and Chevron Chemical LLC arising from Chevron Chemical's then-discontinued agrichemical business, which included the design, registration, manufacture, formulation, packaging, labeling, distribution, marketing, and sale of paraquat products in the United States as alleged in this Complaint.

**Harrell's**

48.     Defendant Harrell's is a Florida company.   During the relevant time period, it maintained retail locations and delivery services in Florida, where it sold and/or mixed, *inter alia*, paraquat-containing herbicides.

**Paramount Chemicals & Plastics, Inc.**

49.     Defendant Paramount is a Florida company.   During the relevant time period, it maintained retail locations and delivery services in Florida, where it sold and/or mixed, *inter alia*, paraquat-containing herbicides.

**Paraquat Manufacture, Distribution, and Sale**

50.     ICI, a legacy company of Syngenta, claims to have discovered the herbicidal properties of paraquat in 1955.  The leading manufacturer of paraquat is Syngenta, which (as ICI) developed the active ingredient in paraquat in the early 1960s.

51.     ICI produced the first commercial paraquat formulation and registered it in England in 1962.  Paraquat was first marketed in 1962 under the brand name Gramoxone.  Paraquat first became commercially available for use in the United States in 1964.

52.     In or about 1964, ICI and Chevron Chemical entered into agreements regarding the licensing and distribution of paraquat ("the ICI-Chevron Chemical Agreements").  In or about 1971, ICI Americas became a party to the ICI-Chevron Chemical Agreements on the same terms as ICI.  The ICI-Chevron Chemical Agreements were renewed or otherwise remained in effect until about 1986.

53.     In the ICI-Chevron Chemical Agreements:

- ICI and ICI Americas granted Chevron Chemical a license to their patents and technical information to permit Chevron Chemical to formulate or have

13

formulated, use, and sell paraquat in the United States and to grant sub-licenses to others to do so;

- Chevron Chemical granted ICI and ICI Americas a license to its patents and technical information to permit ICI and ICI Americas to formulate or have formulated, use, and sell paraquat throughout the world and to grant sub-licenses to others to do so;

- ICI and ICI Americas and Chevron Chemical agreed to exchange patent and technical information regarding paraquat;

- ICI and ICI Americas granted Chevron Chemical exclusive rights to distribute and sell paraquat in the United States; and

- ICI and ICI Americas granted Chevron Chemical a license to distribute and sell paraquat in the U.S. under the ICI-trademarked brand name Gramoxone.

54. ICI and ICI Americas and Chevron Chemical entered into the ICI-Chevron Chemical Agreements to divide the worldwide market for paraquat between them. Under the ICI-Chevron Chemical Agreements and related agreements:

- Chevron Chemical distributed and sold paraquat in the U.S. and ICI and ICI Americas distributed and sold paraquat outside the United States.

- Both ICI and ICI Americas and Chevron Chemical distributed and sold paraquat under the ICI-trademarked brand name Gramoxone.

- ICI and ICI Americas and Chevron Chemical exchanged patent and technical information regarding paraquat.

- ICI and ICI Americas provided to Chevron Chemical health and safety and efficacy studies performed or procured by ICI's Central Toxicology Laboratory, which Chevron Chemical then submitted to the USDA and the EPA to secure and maintain the registration of paraquat for manufacture, formulation, distribution, and sale for use in the United States.

- ICI and ICI Americas manufactured and sold paraquat to Chevron Chemical that Chevron Chemical then distributed and sold in the United States, including in Florida, where Chevron Chemical registered paraquat products and marketed, advertised, and promoted them to Florida distributors, dealers, applicators, and farmers.

- Chevron Chemical distributed and sold paraquat in the United States under the ICI-trademarked brand name Gramoxone and other names, including in Florida, where Chevron Chemical registered such products and marketed, advertised, and promoted them to Florida distributors, dealers, applicators, and farmers.

55. SAG and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1964 through the present, and at all relevant times intended or expected their paraquat products to be distributed and sold in Florida, where they registered such products, and marketed, advertised, and promoted them to Florida distributors, dealers, applicators, and farmers.

14

56.     SAG and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the USDA and the EPA to support the registration of paraquat for manufacture, formulation, distribution, and sale for use in the United States from approximately 1964 through the present.

57.     SCPLLC and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1971 through the present, and at all relevant times intended or expected their paraquat products to be distributed and sold in Florida, where they registered such products, and marketed, advertised, and promoted them to Florida distributors, dealers, applicators, and farmers.

58.     SCPLLC and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the EPA to support the registration of paraquat for manufacture, formulation, distribution, and sale for use in the U.S. from about 1971 through the present.

59.     Chevron Chemical manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1964 through at least 1986, acting in concert with ICI and ICI Americas throughout this period, including in Florida, where Chevron Chemical registered such products, and used in Florida, and marketed, advertised, and promoted them to Florida distributors, dealers, applicators, and farmers.

**Paraquat Usage**

60.     Since 1964, paraquat has been used in the U.S. to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops; to control weeds in orchards; and to desiccate (dry) plants before harvest.  At all relevant times, where paraquat was used, it was commonly used multiple times per year on the same land, particularly when used to control weeds in orchards or on farms with multiple crops planted on the same land within a single growing season or year, and such use was as intended or directed or reasonably foreseeable.

61.     At all relevant times, paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, was typically sold to end-users in the form of liquid concentrates (and less commonly in the form of granular solids) designed to be diluted with water before or after loading it into the tank of a sprayer and applied by spraying it onto target weeds.

62.     At all relevant times, concentrates containing paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated with one or more "surfactants" to increase

the ability of the herbicide to stay in contact with the leaf, penetrate the leaf's waxy surface, and enter into plant cells, and the accompanying instructions typically told end-users to add a surfactant or crop oil (which as typically formulated contains a surfactant) before use.

63. At all relevant times, paraquat typically was applied with a knapsack sprayer, hand-held sprayer, aircraft (i.e., crop duster), truck with attached pressurized tank, or tractor-drawn pressurized tank, and such use was as intended or directed or was reasonably foreseeable.

**Paraquat Exposure**

64. At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of paraquat and persons nearby would be exposed to paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks.

65. At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, persons who sprayed paraquat or were in or near areas where it was being or recently had been sprayed would be exposed to paraquat, including as a result of spray drift, the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind, and as a result of contact with sprayed plants.

66. At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of paraquat and persons nearby would be exposed to paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned or clogged spray nozzles, lines, or valves were being cleared.

67. At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present.

68. At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurred.

69. At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

16

70.     At all relevant times, it was reasonably foreseeable that paraquat that entered the human body via ingestion into the digestive tract could enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract).

71.     At all relevant times, it was reasonably foreseeable that paraquat that entered the human body, whether via absorption, respiration, or ingestion, could enter the bloodstream.

72.     At all relevant times, it was reasonably foreseeable that paraquat that entered the bloodstream could enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier.

73.     At all relevant times, it was reasonably foreseeable that paraquat that entered the nose and nasal passages could enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier.

## Parkinson's Disease

74.     PD is progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.  Scientists who study PD generally agree that fewer than 10% of all PD cases are caused by inherited genetic mutations alone, and that more than 90% are caused by a combination of environmental factors, genetic susceptibility, and the aging process.

### Symptoms and treatment

75.     The characteristic symptoms of PD are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).  PD's primary motor symptoms often result in "secondary'' motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

76.     Non-motor symptoms-such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression-are present in most cases of PD, often for years before any of the primary motor symptoms appear.

77.     There is currently no cure for PD.  No treatment will slow, stop, or reverse its progression, and the treatments most-commonly prescribed for its motor symptoms tend to become progressively less effective, and to cause unwelcome side effects, the longer they are used.

**Pathophysiology**

78.     The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of PD.  Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).  The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

79.     Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of PD.  The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of PD.  Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.  Scientists who study PD generally agree that oxidative stress is a major factor in—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of PD.

**Paraquat's Toxicity**

80.     Paraquat is highly toxic to both plants and animals.  Paraquat injures and kills plants by creating oxidative stress that causes or contributes to cause the degeneration and death of plant cells.  Paraquat injures and kills humans and other animals by creating oxidative stress that causes or contributes to cause the degeneration and death of animal cells.  Paraquat creates oxidative stress in the cells of plants and animals because of "redox properties" that are inherent in its chemical composition and structure: it is a strong oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

81.     The redox cycling of paraquat in living cells interferes with cellular functions that are necessary to sustain life—photosynthesis in the case of plant cells and cellular respiration in the case of animal cells.  The redox cycling of paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids—molecules that are essential components of the structures and functions of living cells.  Because the redox cycling of paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of paraquat can trigger the production of countless molecules of destructive superoxide

18

radical.  Significantly, Paraquat's redox properties have been known by Defendants (information not shared with the general public nor users) since at least the 1930s.

82.     That paraquat is toxic to the cells of plants and animals because it creates oxidative stress through redox cycling has been known since at least the 1960s (information not shared with the general public nor users).   The surfactants with which the concentrates containing paraquat manufactured, distributed, and sold by Defendants,  Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated were likely to increase paraquat's toxicity to humans by increasing its ability to stay in contact with or penetrate the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, the lungs, and the gastrointestinal tract.

**Paraquat and Parkinson's Disease**

83.     Defendants knew or had reason to know that the same redox properties that make paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons, casing PD.  Defendants failed to disclose this knowledge, leaving the general public, end-users and Plaintiff not knowing about this risk.

**Paraquat Regulation**

84.     The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., which regulates the distribution, sale, and use of pesticides within the United States, requires that pesticides be registered with the EPA prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).  As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

85.     As a general rule, FIFRA requires registrants to perform health and safety testing of pesticides. FIFRA does not, however, require the EPA to perform health and safety testing of pesticides itself, and the EPA generally does not perform such testing.

86.     The EPA registers (or re-registers) a pesticide if it believes, based largely on studies and data submitted by the registrant, that:

    a.  its composition is such as to warrant the proposed claims for it, 7 U.S.C. § 136a(c)(5)(A);

    b.  its labeling and other material required to be submitted comply with the requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B);

    c.  it will perform its intended function without unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(C); and

      d.   when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(D).

87.    FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  Under FIFRA, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2).  However, FIFRA further provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

88.    The distribution or sale of a pesticide that is misbranded is an offense under FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person . . . any pesticide which is . . . misbranded." 7 U.S.C. § 136j(a)(1)(E).  A pesticide is misbranded under FIFRA if, among other things:

      a.   its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients that is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);

      b.   the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under Section 136a(d) of the title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or

      c.   the label does not contain a warning or caution statement that may be necessary and if complied with, together with any requirements imposed under section 136a(d) of the title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(l)(G).

89.    Plaintiff does not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA; accordingly, any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of paraquat or warnings about paraquat, breached a duty to provide adequate packaging for paraquat, or concealed, suppressed, or omitted to disclose any material fact about paraquat or engaged in any unfair or deceptive practice regarding paraquat, that allegation is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the paraquat "misbranded" under FIFRA; however, Plaintiff brings claims

20

and seeks relief in this action only under state law, and do not bring any claims or seek any relief in this action under FIFRA.

**Daniel Stevens' Exposure to Paraquat**

90.     Plaintiff Daniel Stevens ("Mr. Stevens") married Plaintiff Mary Stevens ("Mrs. Stevens") in 1968.

91.     Mr. Stevens (DOB: 04/21/1948) was exposed to Paraquat and/or paraquat-containing products, which had been manufactured, supplied, produced, mixed and/or placed into the stream of commerce by Defendants.

92.     The Stevens owned and operated Quail Run Nursery ("QRN"), a palm tree nursery, in or around St. James City, Florida beginning in 1974.  QRN is currently located at 3900 Garden View Dr, Saint James City, FL 33956.

93.     Beginning in 1974 and until Mr. Stevens stopped working at the nursery in the mid to late 2010s, Mr. Stevens mixed, loaded, applied, sprayed and was exposed to paraquat in the course of his agricultural work.

94.     Mr. Stevens used a sprayer hitched to an open-cab tractor and/or a backpack sprayer to spray paraquat and/or paraquat-containing products in the course of his work at QRN.  This paraquat and/or paraquat-containing product was purchased at Harrell's and/or Paramount and designed, manufactured, distributed and/or sold by Chevron U.S.A, CP Chemical, Syngenta and/or Syngenta AG.  The containers of paraquat and/or paraquat-containing product were labeled with the words "Paraquat," "Chevron," "Gramoxone" and/or "Ortho."

95.     As part of this work, Mr. Stevens mixed paraquat and/paraquat containing concentrates.  As part of the spraying process, Mr. Stevens would sometimes have to re-enter already sprayed fields to spray additional rows of trees.  This occurred the day after the spraying occurred.  Mr. Stevens would often have to clean and unclog spray nozzles used to spray the paraquat and/or paraquat-containing product.  During the spraying process, Mr. Stevens' skin was exposed to paraquat and/or paraquat-containing product.  He also breathed in paraquat and/or paraquat-containing product while spraying it.

96.     When he was not using a tractor to spray the product, Mr. Stevens used a backpack sprayer.  The backpack sprayer was equipped with two-and-a-half gallon tanks.  While spraying the paraquat and/or paraquat-containing product, Mr. Stevens recalls incidents in which the paraquat and/or paraquat-containing product leaked from the backpack sprayer container and came into contact with his back.  The paraquat and/or paraquat-containing product came into contact with the skin on his back and ran down his back because the cap of the backpack container leaked.

97.     As a direct and proximate result of these exposures, Plaintiff Daniel Stevens developed Parkinson's disease ("PD"), which he was diagnosed with on or about 2005.  He has now suffered with PD for roughly 19 years.

98.     Critically, before 2022:

- No doctor told Plaintiffs that his Parkinson's disease was or could have been caused by exposure to paraquat.

- Plaintiffs had never read or heard of any articles in newspapers, scientific journals, or other publications that associated Parkinson's disease with paraquat until .

- Plaintiffs never read or heard of any lawsuit alleging that paraquat causes Parkinson's disease.

Moreover, at no time when using paraquat himself were Plaintiffs aware that exposure to paraquat could cause any latent injury, including any neurological injury or Parkinson's disease, or that any precautions were necessary to prevent any latent injury that could be caused by exposure to paraquat.

99.     The paraquat to which Mr. Stevens was exposed was sold and used in Florida, and was manufactured, distributed, and, on information and belief, sold by one or more of the Defendants and their corporate predecessors and others with whom they acted in concert intending or expecting that it would be sold and used in Florida.

100.    On information and belief, Plaintiff Daniel Stevens was exposed to paraquat:

- manufactured, distributed, and sold at different times as to each Defendant, its corporate predecessors, and others with whom they acted in concert, and not necessarily throughout the entire period of his exposure as to any particular Defendant, its corporate predecessors, and others with whom they acted in concert;

- that was sold and used in Florida, and was manufactured, distributed, and sold by SCPLLC, its corporate predecessors, and others with whom they acted in concert, including Chevron Chemical, intending, or expecting that it would be sold and used in Florida;

- that was sold and used in Florida, and was manufactured, distributed, and sold by SAG, its corporate predecessors, and others with whom they acted in concert, including Chevron Chemical, intending, or expecting that it would be sold and used in Florida;

- that was sold and used in Florida, and was manufactured, distributed, and sold by Chevron Chemical, acting in concert with ICI and ICI Americas, intending or expecting that it would be sold and used in Florida; and

- that was sold and used in Florida and was distributed and sold by Harrell's and Premier.

22

## COUNT I - NEGLIGENCE

101.    Plaintiffs incorporate by reference into Count I all other relevant allegations in this complaint.

102.    At the time of Plaintiff DANIEL STEVENS's exposure to Defendants' Paraquat-Containing Products, Defendants knew, or in the exercise of ordinary care should have known, that the use of their Paraquat-Containing Products was hazardous to the health of workers, consumers, bystander, and family members.  Plaintiff relied upon the skill and knowledge of the Defendants, who had a duty to advise users of their products and those who were reasonably expected to use, work with and/or work around any of their Paraquat-Containing Products of the proper methods or handling and working around paraquat containing materials.

103.    At the time of Plaintiff's exposure to Defendants' Paraquat-Containing Products, Defendants knew, or in the exercise of ordinary care should have known, that the potential hazards of their Paraquat-Containing Products were not obvious or otherwise known to ordinary users such as Plaintiff, or those working with or around him.  Defendants had a duty to warn Plaintiff and those working with and around him of any information regarding the potential dangers of paraquat and the proper methods of handling and working around paraquat and paraquat-containing material.

104.    Defendants had a duty to exercise reasonable and ordinary care to the Plaintiff. Defendants negligently breached that duty in one, some, or all of the following respects:

    a.  Defendants failed to adequately warn Plaintiff that exposure to Paraquat-Containing Products could be injurious to his health;

    b.  Defendants failed to adequately warn Plaintiff that the ordinary handling, use, and servicing of their Paraquat-Containing Products would cause fumes to become airborne and could be injurious to his health;

    c.  Defendants failed to provide with their Paraquat-Containing Products necessary information regarding how Plaintiff could and should protect himself from paraquat in connection with the use of their Paraquat-Containing Products, including safe handling and use, appropriate protective clothing and equipment, and other protective measures;

    d.  Defendants filed to take reasonable steps to provide Plaintiff with information regarding the danger of exposure to paraquat in connection with their Paraquat-Containing Products, when those products were being used or serviced by others;

    e.  Defendants failed to provide warnings to Plaintiff regarding the danger of past exposures to paraquat in connection with the use of Defendants' Paraquat-Containing Products as additional information regarding the dangers of paraquat became available to them;

    f.  Defendants failed to exercise reasonable care to develop, publish, adopt and disseminate safe methods of spraying paraquat containing materials in connection

with their Paraquat-Containing Products, having undertaken to develop, publish, adopt and disseminate other information regarding the service, handling and installation of such materials;

g.  Defendants failed to use reasonable care to ensure that their Paraquat-Containing Products were only distributed to, serviced and/or handled by entities and individuals who had been sufficiently trained in their safe use;

h.  Defendants failed to provide accurate information to Plaintiff and other members of the public regarding the dangers of paraquat and their Paraquat-Containing Products by advertising, labeling and otherwise;

i.  Defendants further negligently misrepresented affirmatively and by omission that the Paraquat-Containing Products they manufactured, sold or distributed were safe in their ordinary and foreseeable use, when such representation was untrue;

j.  Defendants failed to provide to Plaintiff the information that they provided to their own employees regarding the hazards of paraquat and their Paraquat-Containing Products;

k.  Defendants failed to test their Paraquat-Containing Products and/or failed to disseminate the results of tests that they did conduct;

l.  Defendants failed to warn or advise Plaintiff and others to cease all future exposure to paraquat;

m.  Defendants failed to develop and to place on the market non-paraquat containing materials that were reasonably available to them;

n.  Defendants' Paraquat-Containing Products were used in the manner in which they were intended to be used; however, Defendants' Paraquat-Containing Products failed to perform their purpose safely, in that they caused Plaintiff to develop Parkinson's disease;

o.  Plaintiff's injuries are a direct and proximate result of Defendants' negligence as described above and Plaintiff has suffered damages as described herein.

WHEREFORE, Plaintiffs demand compensatory damages and trial by jury on all issues so triable in this cause.

## COUNT II – STRICT LIABILITY

105.  Plaintiffs incorporate by reference into Count II all other relevant allegations in this complaint.

106.  Defendants' Paraquat-Containing Products were defective in design at the time they were manufactured and at the time Plaintiff was exposed to them.

107.  At the time Plaintiff used and otherwise came into contact with Defendants' Paraquat-Containing Products, Defendants' products were being used in the manner and environment intended and without substantial or unexpected change affecting their condition.

108.    Defendants' Paraquat-Containing Products contained design defects that made them unreasonably dangerous and unfit for their intended use, in that the products were designed to contain paraquat.

109.    At the time of Plaintiff's exposure to Defendants' Paraquat-Containing Products, Defendants' Paraquat-Containing Products were unreasonably dangerous because of their design in that they failed to perform as safely as an ordinary consumer would expect when used in the intended manner and/or manner reasonably foreseeable to the Defendants.

110.    At the time of Plaintiffs' exposure to Defendants' Paraquat-Containing Products, Defendants' Paraquat-Containing Products were unreasonably dangerous because of their design in that the risk of harm from the design of those products containing paraquat outweighed the benefits of use of the product.

111.    Defendants' Paraquat-Containing Products were also defective in that they failed to contain sufficient warnings to advise Plaintiff that the ordinary and expected uses of the products could cause grave harm.

112.    The lack of sufficient warning further rendered Defendants' Paraquat-Containing Products unreasonably dangerous and unfit for their intended and expected use.

113.    Defendants' Paraquat-Containing Products were further defective because non-paraquat-containing substitutes were reasonably available to Defendants.

114.    Plaintiff's injuries are a direct and proximate result of Defendants' conduct as described above and Plaintiff has suffered damages as described herein.

WHEREFORE, Plaintiffs demand compensatory damages and trial by jury on all issues so triable in this cause.

## COUNT III – LOSS OF CONSORTIUM

115.    Plaintiffs incorporate by reference into Count IV all other relevant allegations in this complaint.

116.    Plaintiff MARY STEVENS is, and at all times since December 26, 1966 has been, the lawful spouse of Plaintiff DANIEL STEVENS.  At the time that DANIEL STEVENS was diagnosed with Parkinson's disease, MARY STEVENS was cohabitating with DANIEL STEVENS and enjoying his companionship and care.

117.    As a direct and proximate result of the conduct described in the allegations contained in all Counts of this Complaint, and Plaintiff's resulting disease, Plaintiff MARY STEVENS has suffered the loss of consortium and damage to the marital and social relationship, including but not limited to (1) the loss of DANIEL STEVENS's services, comfort, affection and (2) the effects of

DANIEL STEVENS's disease upon their relationship and daily activities.  They have further incurred expenses for medical attention rendered to DANIEL STEVENS and will continue to incur such expenses.

WHEREFORE, Plaintiffs demand compensatory damages and trial by jury on all issues so triable in this case.

## DAMAGES

118.  As a direct and proximate result of the negligence, carelessness, gross negligence, willful misconduct, strict liability, misrepresentation and willful omissions of the Defendants as described, Plaintiff contracted diseases and injuries causing the Plaintiff to suffer physical pain, and mental anguish.

119.  Each exposure to the paraquat-containing products of Defendants was harmful and caused or contributed to Plaintiff's injuries.  Plaintiff's injuries arose out of or were connected to, and were incidental to, the manufacture, sale and distribution by Defendants of their paraquat-containing products.

120.  As a direct and proximate result of the conduct described, Plaintiffs were obliged to spend various sums of money to treat DANIEL STEVENS's disease and injuries, and Plaintiffs continue to be obliged for the expenses of same.  As a direct and proximate result of Defendants' conduct, Plaintiff's enjoyment of life and earning capacity has been impaired and his life expectancy shortened.

121.  From the time Plaintiff first learned of his disease, he has suffered mental and physical pain and anguish as a result of his disease.  Additionally, Plaintiff is at an increased risk of death and has, and will incur, expenses to monitor his condition and to provide the necessary care to deal with his disease.  Additionally, Plaintiff has suffered, and will continue to suffer, mental anguish.

122.  As a direct and proximate result of the aforesaid, and since Plaintiff first learned of his aforementioned injuries, he has developed severe anxiety, hysteria or phobias, any or all of which have developed into a reasonable and traumatic fear of the progression of his Parkinson's disease, including, but not limited to, death resulting from exposure, directly and indirectly, to the Paraquat-Containing Products of the Defendants.

123.  As a direct and proximate result of the aforesaid, Plaintiff has suffered, and will continue to suffer, ongoing psychological damage which may require future psychological and/or medical treatment.

124.  As a direct and proximate result of the Defendants' conduct, Plaintiff has suffered, and will continue to suffer, a disintegration and deterioration of his family unit and his familial

26

relationships, resulting in enhanced anguish, depression, and other symptoms of psychological stress and disorder.

125.    For the reckless, willful, intentional, gross negligent, and wanton acts and omission of said Defendants previously alleged, Plaintiff DANIEL STEVENS is entitled to recover damages from said Defendants, including punitive damages.

126.    As a direct and proximate result of the conduct described in the allegations contained in all Counts of this Complaint, and Plaintiff's resulting disease, Plaintiff MARY STEVENS has suffered the loss of consortium and damage to the marital and social relationship, including but not limited to (1) the loss of DANIEL STEVENS's services, comfort, affection and (2) the effects of DANIEL STEVENS's disease upon their relationship and daily activities.  Plaintiffs have further incurred expenses for medical attention rendered to DANIEL STEVENS and will continue to incur such expenses.

WHEREFORE, Plaintiffs request judgment against the Defendants for compensatory (economic and non-economic) and punitive damages as set forth above and Plaintiffs further seek interest, including prejudgment interest.

## DEMAND FOR JURY

Plaintiffs demand trial by jury on all issues.


DATE:    October 16, 2024


Respectfully submitted,


/s/ Rebecca S. Vinocur

REBECCA S. VINOCUR
Florida Bar No. 529915
REBECCA S. VINOCUR, P.A.
5915 Ponce De Leon Blvd., Ste 14
Coral Gables, Florida 33146
T. 786-691-1282
F. 786-691-1283
rvinocur@rsv-law.com

27